**Thomas E. WINKEL, Plaintiff,**

**v.**

**KENNECOTT HOLDINGS CORPORATION, et al., Defendants.**

**No. 2:97 CV 930 K.**

United States District Court, D. Utah, Central Division.

April 27, 1999.

Cass C. Butler, Mr., W. Waldan Lloyd, Mr., Callister Nebeker & McCullough, Salt Lake City, UT, Alfred H. Sigman, Teresa S. Renaker, Jeffrey Lewis, Sigman Lewis & Feinberg, Oakland, CA, for Thomas E. Winkel.

David A. Anderson, W. Mark Gavre, Parsons Behle & Latimer, Salt Lake City, UT, for Kennecott Holdings, Kennecott Corporation Retirement Accumulation Plan, Kennecott Corporation Savings and Investment Plan, Kennecott Corporation 1997 Reduction–In–Force Severance Plan, Alan Stuyvesant, Kennecott Services, Kennecott Management Services, RTZ America, RTZ Corporation PLC, Rio Tinto PLC, CRA Limited, Rio Tinto Limited.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the Court on Defendants'[1] motion for summary judgment and Plaintiff Thomas Winkel's motion for partial summary judgment.

---

1. As used in this decision, "Defendants" refers collectively to all of the defendants in this case: Kennecott Holdings Corporation, Kennecott Corporation, Kennecott Management Services Company, RTZ America, Inc., Kennecott Corporation Retirement Accumulation Plan; Kennecott Corporation Savings and Investment Plan; Kennecott Corporation 1997 Reduction–in–Force Severance Plan, and Alan Stuyvesant. "Kennecott" refers, as the context requires, either to Plaintiff's direct employer, Kennecott Corporation, or collectively to the first three of the above-listed business entities.

## I. FACTUAL BACKGROUND

Plaintiff's claims stem from his contention that he should have been allowed to participate in an involuntary severance plan that was developed and implemented by his employer shortly after he retired. Given the law to be applied, a detailed account of the timing and circumstances both of Plaintiff's decision to retire and his employer's decision to implement the new plan is required.

### Plaintiff's Resignation

Plaintiff voluntarily retired from Kennecott Corporation after 30 years of service in late January 1997. He did so by sending an e-mail message to company benefit manager Debbi Kawaguchi, who responded by phoning Plaintiff to suggest that he take his five weeks of accrued vacation before retiring in order to continue receiving service credit for benefit plan purposes during his vacation period, shifting the effective date of his retirement from March 1, 1997, to April 1, 1997. Plaintiff accepted her suggestion and worked his last day on February 25, 1997. Before leaving that day, he cleaned out his desk, took his personal property home, and turned in his company keys. Prior to Winkel's last day of work, on February 12, 1997, Kennecott hired a replacement for him, Curtis Lefler.

On February 26th, Plaintiff received his retirement benefit election and distribution forms from Kawaguchi. On March 14th, Plaintiff returned the completed forms to her.

Around the time of his resignation, Plaintiff asked the manager of his work group, James Mackay, and Mackay's supervisor, Neil MacArthur, if they were aware of impending changes in the benefit plans that might enhance his retirement. Just after Plaintiff had e-mailed his resignation to Kawaguchi, Plaintiff asked MacArthur if he "was aware of anything coming down within the company before [he] got out." *Plaintiff's Deposition, at 65.*

Just prior to receiving his benefit election forms, Plaintiff asked Mackay the same question. Both responded by stating that he was not aware of anything. At no time did Plaintiff ask Kawaguchi about the possibility of future changes in severance plan benefits.

### Kennecott's Adoption of the Involuntary Severance Plan

Unbeknownst to any of them, a major corporate restructuring was in the works. It is the events leading up to the public announcement of that restructuring that are important here because, in connection with that restructuring, Kennecott adopted a new, and more generous, involuntary severance plan—an employee welfare benefit plan covered by the Employee Retirement Income Security Act ("ERISA").

In December 1995, Kennecott's parent company, RTZ Corporation PLC, a British mining company, entered into what is known as a dual company listed merger with CRA Limited, an Australian mining company. This resulted in a merger of their economic interests, though each company maintained a separate legal identity and each company's stock continued to be listed and traded separately. Prior to June 1997, the combined company was referred to as RTZ/CRA; after June 1997, it was referred to as Rio Tinto.[2]

On January 15, 1997, the chairman of Rio Tinto, Robert Wilson, and the chief executive officer, Leon Davis, met with Australian Rio Tinto executive Jonathan Leslie. They told him that there was going to be a world-wide reorganization of RTZ/CRA along commodity or product lines rather than geographic lines and gave him the assignment of moving to Salt Lake City to reorganize Kennecott's operations in the United States, explaining that the corporate office in Salt Lake City, in which Plaintiff worked, would probably no longer be needed.

---

**2.** In June 1997, the two companies' names were changes. The RTZ Corporation PLC became Rio Tinto plc and CRA Limited became Rio Tinto Limited.

Based on this meeting, Leslie understood that he was responsible for deciding what the reorganized structure of Kennecott would be. He had never worked for Kennecott and wanted to first learn what the entity's existing functions were and to get the views of senior executives at Kennecott on the matter.

Leslie also understood that the reorganization was very sensitive and was to be kept as confidential as possible prior to its public announcement. He arrived in Salt Lake City on February 12, 1997, but did not inform any Kennecott manager of the planned reorganization until February 17th, when he told Tracy Stevenson, Senior Vice President, Finance and Control. Leslie asked Stevenson which additional Kennecott managers should then be informed; Stevenson recommended Richard Pierce, Senior Vice President, Law and General Counsel, and Ron Skaer, Senior Vice President, Human Resources. Leslie spoke only to Stevenson at that time.

Between February 20th and 25th, Stevenson and Leslie discussed the range of severance benefits that had been paid in the past at various Kennecott companies. On February 24th, Stevenson contacted Kwasha Lipton, Kennecott's outside actuaries, and asked them to provide employment cost estimates for all active Kennecott corporate employees under four different scenarios: (1) ongoing employment costs (with no terminations); (2) termination costs if all employees were terminated with no special benefits provided; (3) termination costs under the existing separation pay guidelines (one month of notice pay and one week of separation pay per year of service); and (4) termination costs using two months notice pay and two weeks of pay per year of service.

On February 26th, a meeting was held in New York with the attorneys advising Kennecott regarding the reorganization. The meeting was attended by Leslie; Pierce; Stevenson; Tom Albanese, group exploration executive on assignment to the Rio Tinto exploration department; and Brian Burgess from the human resources department of Rio Tinto plc in London. A variety of issues were discussed, including a time table for moving forward with the reorganization. Regarding severance terms, the only discussion regarding possible economic terms was the view expressed by Pierce and Stevenson that they would prefer the severance benefits to be more generous than those provided by the existing separation pay guidelines. Toward that end, a new "transaction specific" severance plan document was to be developed. However, no decision was made about what the terms of the new plan would be, including whether its terms would be the same or different from the existing guidelines.

Following the meeting, Leslie believed that before any decision on severance terms could be made, additional Kennecott executives would have to be brought into the discussions, cost data from the actuaries would have to be obtained, and organizational issues would have to be addressed and resolved by the larger group, including the number of people to be terminated, which in turn depended on the new organization's requirements. Leslie also needed to obtain input from other Rio Tinto companies in order to ensure that the terms of the new severance plan were not materially different from those being developed for implementation elsewhere within Rio Tinto, particularly within CRA Limited in Australia.

On March 2, 1997, a meeting was held at the Red Lion Hotel in Salt Lake City to address the reorganization. Additional Kennecott executives were first brought into the discussion at that time, including Skaer. However, in order to keep the planning as confidential as possible, only a subset of the Kennecott Corporation Executive Committee was invited to attend. Severance terms were again discussed, including the terms of the existing severance guidelines, terms used at other reductions in force in other Kennecott business units,

and the fact that the terms of the Australian plan were not yet known.

According to Skaer's typewritten meeting notes, the group agreed that the existing severance guidelines were "probably not appropriate for this reduction in force." While certain possible severance options were identified, further information was needed before any decision could be made, including severance cost information. For that reason, nothing was ruled out.

In the following week, Kennecott managers began assessing the new organizational requirements and considering individual employees in relation to those requirements. At the final meeting the group of Kennecott managers had, during the week of March 10th to 14th, Stevenson informed the group that he had received cost information from Kwasha Lipton, and the group agreed that, depending on the Australian severance terms, they would like to see one of the options on the more generous end of the spectrum of benefits be chosen. On March 10th or 11th, Leslie gave Stevenson a document summarizing the Austalian severance terms. Stevenson judged that they were generally consistent with the severance option of two months notice pay and three weeks pay per year of service. Following receipt of that information, Stevenson prepared and showed to Leslie a summary of severance term options, which was sent to Kwasha Lipton for the preparation of final cost calculations.

On March 18th, the world-wide reorganization was publicly announced, the new severance plan (the "Severance Plan")[3] was adopted, and the fact of the reduction in force and adoption of the Severance Plan was announced to Kennecott employees. Under the Severance Plan, terminated employees received two months of notice pay and three weeks of separation pay per year of service. By its terms, the Severance Plan covered only employees

that Kennecott, in its sole discretion, selected for involuntarily termination on or after March 18, 1997, in connection with the closure of the corporate office.

*Selection of Employees for Termination in the MIS Department*

By March 4th, Skaer had drafted a handwritten list identifying certain employees for termination or transfer, including two employees within the Management Information Services ("MIS") Department in which Plaintiff had worked—Rein Rand and Steve Hill. However, the final decision regarding who would be terminated from that department was not made until March 17th, when MacArthur was first told about the reorganization. Based on the objectives Kennecott then needed to achieve, MacArthur selected Steve Hill and Don Floyd, who were working at a help desk within the department that was eliminated in the reorganization. On March 19th, termination notice letters were sent to them.

Within the next few days after the March 18th public announcement, MacArthur was approached by four different people within the MIS Department who volunteered to be terminated and receive benefits under the plan. Those persons were Mackay, the manager of Plaintiff's work group, and three of Plaintiff's co-workers who held the same title as Plaintiff and who worked under the same immediate supervisor. MacArthur denied each of those requests on the grounds that the severance plan was an involuntary program, not a voluntary one. MacArthur testified in his deposition that even if Plaintiff had not elected retirement, he would not have chosen him for the reduction in force in the MIS department because Plaintiff, as well as certain other senior systems analysts in the department, had very useful and adaptable skills that MacAruthur considered important to retain.

**3.** Titled the Kennecott Corporation 1997 Reduction–in–Force Severance Plan.

*Plaintiff's Attempt to Return to Work*

Plaintiff was playing golf with another Kennecott retiree on March 18th when he learned about the reduction in force and the adoption of the Severance Plan. Believing that by rescinding his retirement he might be able to participate in the Severance Plan, he phoned Kawaguchi the next day and told her that he wanted to rescind his retirement. Kawaguchi informed Plaintiff that a position for him might not exist when he returned and advised him to contact Alan Stuyvesant, Director of Payroll and Benefit Accounting and Plan Administrator of the Severance Plan. Plaintiff wrote to Stuyvesant, stating, "Since I rescinded my retirement date and wish to return to work, but no position is available, I would assume that I would be an eligible candidate to receive the benefits accorded those individuals to be terminated."

*Kennecott's Response to Plaintiff's Attempt to Return to Work*

On April 22, 1997, Stuyvesant wrote to Plaintiff informing him that his request for inclusion in the Severance Plan was denied on the ground that the plan applied only to individuals terminated by Kennecott after March 18th and that his request to return to work was denied inasmuch as the company, having accepted his retirement and reassigned his work to others, was not obligated to accept his withdrawal of that resignation.

Plaintiff then filed suit, asserting three claims for relief under ERISA: (1) breach of fiduciary duty in violation of 29 U.S.C. § 1104(a) in not disclosing that a new severance plan was under serious consideration and that his retirement would become irrevocable prior to its actual effective date; (2) discrimination motivated by intent to interfere with employee benefits in violation of 29 U.S.C. § 1140 in refusing to allow him to rescind his retirement and in failing to advise him that by completing his retirement benefit election forms he was making an election to retire that became irrevocable prior to his effective retirement date; and (3) failure to provide plan information upon request in violation of 29 U.S.C. § 1132(a)(1)(A).

## II. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element. "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." *Wolf v. Prudential Ins. Co.*, 50 F.3d 793, 796 (10th Cir.1995). In applying the summary judgment standard, the factual record and reasonable inferences therefrom are to be examined in the light most favorable to the non-movant. *Id.*

## III. DISCUSSION

### A. Standing.

■ As a threshold matter, this Court must determine whether this plaintiff has standing. The enforcement provisions of ERISA identify six types of civil actions that may be brought by various parties. 29 U.S.C. § 1132(a). Winkel asserts that his first and second claims to relief are authorized by § 1132(a)(3) and that his third claim for relief is authorized by § 1132(a)(1)(a).

The former, § 1132(a)(3), provides that a civil action may be brought by a participant to enjoin any act or practice that violates any provision of Title I of ERISA or to obtain other appropriate equitable relief. Through this section, Winkel seeks to redress alleged violations of two Title I provisions: 29 U.S.C. § 1104(a), which sets

forth standards of conduct for ERISA fiduciaries, and 29 U.S.C. § 1140, which makes it unlawful to "discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." The latter, § 1132(a)(1)(a), permits a participant to bring a civil action to recover penalties for a plan administrator's failure to comply with a request for information.

Defendants assert that Plaintiff lacks standing because he is not a "participant." Under ERISA, the term "participant" means "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). The Supreme Court has ruled that a former employee may become eligible to receive benefits when he has "a reasonable expectation of returning to covered employment or ... a colorable claim to vested benefits." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 118, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Defendants assert that Plaintiff does not meet the first criterion because Plaintiff has no expectation of returning to work—Plaintiff does not seek reinstatement in this action and testified in his deposition that he does not intend to work anywhere. Plaintiff does not dispute this assertion.

Defendants assert that Plaintiff does not meet the second criterion because Plaintiff does not claim to be entitled to benefits under the Severance Plan. Defendants assert that even if Plaintiff did claim benefits, his claim is not colorable because the clear terms of the Severance Plan show he has no such entitlement. Only employees selected by Kennecott managers for termination in the reorganization process are entitled to any benefits under the plan.

Winkel asserts that he is not required to show that he has a colorable claim for benefits under the Severance Plan in order to assert a claim under either § 1104(a) or § 1140. As authority, Winkel cites *Varity Corp. v. Howe,* 516 U.S. 489, 507–15, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) *(concerning* § 1104(a)*)*, and *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Railway Co.,* 520 U.S. 510, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997) *(concerning* § 1140*)*. The plaintiffs in *Varity* were entitled to equitable relief under § 1104(a) even though they were not employees, had no expectation of returning to covered employment, and had no vested benefits remaining to be paid. *See Varity,* 516 U.S. at 493–95, 515, 116 S.Ct. 1065. Similarly, the plaintiffs in *Inter–Modal* were entitled to assert a claim under § 1140 even through they alleged they were deprived of welfare benefits, which do not vest. 520 U.S. 510 at ——, 117 S.Ct. at 1515, 137 L.Ed.2d 763. Given these authorities, this Court finds that Winkel has standing to bring the three claims he asserts.

## B. Winkel's § 1104(a) Claim.

Both sides move for summary judgment on Winkel's § 1104(a) breach of fiduciary duty claim. The fundamental issue presented by Plaintiff's breach of fiduciary duty claim is whether, in the context of anticipated changes to an employer's *involuntary* severance benefit plan, an employer has a fiduciary duty to disclose deliberations about such changes prior to their formal adoption.

The Court of Appeals for the Tenth Circuit and other courts have developed rules addressing an employer's fiduciary duty in the context of anticipated changes to *voluntary* early retirement plans. Under those cases, once an employer's deliberations constitute "serious consideration" of a change in plan benefits, fiduciaries cannot make "affirmative misrepresentations" to inquiring employees about the employer's deliberations. *See Hockett v. Sun Co., Inc.,* 109 F.3d 1515, 1521 (10th Cir.1997). No reported cases apply the serious consideration analysis to involuntary severance plans.

Defendants argue against application of the analysis or test to cases involving involuntary, discretionary plans. Defendants assert that the test, which was developed to ensure that fiduciary misrepresentations regarding the status of new voluntary plans would not deprive employees of their crucial right to elect retirement benefits, has no application in circumstances, such as here, where an employee never had any right of election. Defendants argue further that even if the test did apply, Plaintiff's claim still fails as a matter of law because Plaintiff made no inquiry to any Kennecott employee regarding a possible change in benefits after the Severance Plan was under serious consideration. According to Defendants, the earliest date on which serious consideration of a change in severance plan benefits could have occurred was March 2, 1997, and, according to Plaintiff's own testimony, the only inquiries he ever made occurred prior to his last day of work on February 25, 1997.

In response, Winkel argues that an employer cannot divest itself of a fiduciary duty to inform plan participants of impending changes that might affect them by including a discretionary element in the plan, no matter how major. Instead, Winkel emphasizes that nothing in the Severance Plan explicitly excluded him from consideration. Winkel also argues that this Court need not resolve the question of whether fiduciaries have a duty to disclose in the absence of an inquiry from a participant because, first, Winkel did inquire about the possibility of enhancing his retirement benefits while the Severance Plan was under serious consideration, and, second, Kawaguchi, having advised Winkel concerning when he should retire in order to maximize benefits, had an affirmative duty to supplement or correct that recommendation once plan changes were being considered.

█ In the absence of direction from the Tenth Circuit or other higher authority, this Court declines to apply the serious consideration test to involuntary severance plans for two reasons. First, the duty of disclosure that springs into existence when the serious consideration test is satisfied represents a carefully-considered compromise of an employer's rights as a business entity and an employer's duties as an ERISA fiduciary. *See Hockett,* 109 F.3d at 1522–23. This compromise was reached with reference to voluntary severance plans. Because an employee has no right to participate in an involuntary plan, it follows that an employer should have even less of an obligation to disclose its deliberations concerning such a plan. This Court declines to recognize a disclosure duty that is not consistent with the balance struck in *Hockett.*

This Court is also reluctant to impose a duty to disclose deliberations concerning an involuntary plan given the lack of an appropriate remedy. The present case is illustrative of the difficult factual disputes that would have to be resolved before a fair remedy could be fashioned the plaintiff former employee claims that he surely would have been included as a plan participant and the defendant employer claims that the plaintiff surely would not have been.[4]

█ Even if this Court were to apply the serious consideration test here, Plaintiff's claim would still fail because no affirmative misrepresentations were made to Winkel after the plan was under serious consideration. This Court need not determine the precise date on which serious consideration occurred in order to reject Plaintiff's claim. Reviewing the undisputed facts of this case with the *Hockett*

4. Plaintiff argues that Defendants should not be permitted, after committing a wrong, to place the burden on Plaintiff to prove what would have happened if he had been allowed to rescind his retirement and had been an active employee at the time the Severance Plan was announced. This argument, however, begs the question at issue, namely, whether Defendants committed a wrong.

guidelines in mind, it is clear that the Severance Plan was not under serious consideration prior to Plaintiff's last day of work, February 25, 1997, and it is undisputed that Plaintiff made no inquiries after that.[5]

▪ This Court also declines to recognize Plaintiff's claim that Kennecott breached a fiduciary duty by failing to inform him that his resignation was irrevocable. Kennecott's decision about whether to so inform him was a mere employment decision, not governed by ERISA. Plaintiff has cited no contrary authority.

In sum, this Court finds that an employer does not violate ERISA-imposed fiduciary duties by failing to disclose deliberations concerning future changes to an involuntary severance plan or by failing to inform an employee that his resignation is irrevocable.

## C.  Winkel's § 1140 Claim.

Section § 1140 was enacted to protect the *employment status* of plan participants against wrongful terminations to deprive them of the right to attain employee benefits. Plaintiff alleges Defendants violated § 1140 by refusing to allow him to rescind his retirement and in failing to advise him that by completing his retirement benefit election forms he was making an election to retire that became irrevocable prior to his effective retirement date

▪ Under § *1140*, a plaintiff must prove by a preponderance of the evidence that he suffered an adverse employment action "motivated by an intent to interfere with employee benefits protected by ERISA." *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir.1993) *(internal citation omitted)*. The plaintiff "is not required to show that the employer's sole motivation was to interfere with employee

benefits[;] she need only show that it was a motivating factor." *Garratt v. Walker,* 164 F.3d 1249, 1256 (10th Cir.1998). "An employee may rely upon direct or indirect proof." *Id.*

Claims are analyzed using the *McDonnell Douglas* burden-shifting analysis. Under the *McDonnell Douglas* framework, the plaintiff must first demonstrate a prima facie case of discrimination, which gives rise to a presumption of discrimination. Next, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action. In order to prevail, the plaintiff must then demonstrate that the defendant's reason was a mere pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) *(applying framework in Title VII case).*

▪ Based upon the undisputed facts here, Plaintiff's allegations fail to raise any genuine issue of unlawful discrimination under § 1140. Plaintiff informed Kennecott in late January 1997 that he was resigning as a means of retiring. Thereafter, effective February 12, 1997, Kennecott hired a replacement. Plaintiff does not allege that he was in any way improperly induced to submit his resignation. Nor does Plaintiff allege either that the persons who made and approved the decision to hire his replacement knew about the reorganization or that the personnel forms documenting that Lefler had been hired to replace him are not authentic. Plaintiff's unique situation on March 18, 1997—an employee who had left his job and been replaced—was entirely of his own making and was wholly unrelated to the reorganization. Nor does Plaintiff have any evidence that Kennecott's failure to allow him to return to work was discriminatory. Similarly, Plaintiff has no evidence that

---

5. Plaintiff has not directed the Court to sufficient evidence supporting Plaintiff's on-going dialogue argument. What Plaintiff characterizes as a "dialogue" was simply the provision of benefit election forms to Plaintiff. To im-

pose a duty to disclose in that circumstance would be to impose the general duty of disclosure that courts have to-date been unwilling to recognize.

Defendants' failure to advise him that by completing his retirement benefit election forms he was making an election to retire that became irrevocable prior to his effective retirement date was for the purpose of interfering with his attainment of rights under the Severance Plan.

Even if the evidence did so indicate, Plaintiff's claim suffers from an additional defect. Though Plaintiff purports to be asserting a claim for loss of his employment, he does not seek reinstatement in any position at Kennecott, nor does he seek front or back pay. Plaintiff's failure to claim these § 1140 remedies indicates that he is not really asserting a discriminatory termination claim at all, but, rather, a right to severance benefits that he was never promised.

### D. Winkel's § 1132(c) Claim.

A plan administrator who fails to furnish plan documents upon written request of any participant or beneficiary within 30 days is, in the court's discretion, liable to such participant or beneficiary in the amount of up to $100 per day from the date of such failure or refusal. 29 U.S.C. § 1132(c). Winkel seeks to collect this penalty from Defendant Alan Stuyvesant, the Severance Plan Administrator, for refusing to provide him with Severance Plan documents in response to his written requests dated May 6, 1997, and June 19, 1997. Stuyvesant refused to provide copies until this action was filed on December 10, 1997.

As discussed above, an ERISA participant includes a former employee with a colorable claim that he will prevail in a suit for benefits. Winkel is a participant within that definition, and, hence, was entitled to a copy of the Severance Plan documents within 30 days after first requesting them on May 6, 1997, that is, by June 7, 1997. He did not receive them until December 10, 1997—185 days later. Consequently, in the judgment of this Court, Plaintiff is entitled to a penalty in the amount of $25 per day, or $4625 total.

### IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted. However, Winkel is awarded a penalty pursuant to 29 U.S.C. § 1132(c) in the amount of $4625. Judgment against Defendant Alan Stuyvesant shall be entered in that amount. Each side shall bear his or its own costs.