**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 10 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THOMAS E. WINKEL,

    Plaintiff-Appellant and
    Cross-Appellee,

v.

KENNECOTT HOLDINGS
CORPORATION; KENNECOTT
CORPORATION; KENNECOTT
COPPER CORPORATION, also
known as Kennecott Services;
KENNECOTT CORPORATION
SAVINGS AND INVESTMENT
PLAN; KENNECOTT
CORPORATION 1997 REDUCTION-
IN-FORCE SEVERANCE PLAN;
KENNECOTT MANAGEMENT
SERVICES; RTZ AMERICA,

    Defendants-Appellees,

and

ALAN STUYVESANT,

    Defendant-Appellee and
    Cross-Appellant.

Nos. 99-4114
99-4124
(District of Utah)
(D.C. No. 97-CV-930-K)

THOMAS E. WINKEL,

    Plaintiff-Appellant,

v.

KENNECOTT HOLDINGS
CORPORATION; KENNECOTT
CORPORATION; KENNECOTT
CORPORATION SAVINGS AND
INVESTMENT PLAN; KENNECOTT
CORPORATION 1997
REDUCTION-IN-FORCE
SEVERANCE PLAN; ALAN
STUYVESANT; KENNECOTT
MANAGEMENT SERVICES; RTZ
AMERICA,

       Defendants-Appellees.

No. 99-4150
(District of Utah)
(D.C. No. 97-CV-930-K)

---

**ORDER AND JUDGMENT**[*]

---

Before **BALDOCK**, **EBEL**, and **MURPHY**, Circuit Judges.

---

## I.    INTRODUCTION

Appellant, Thomas E. Winkel, appeals the district court's dismissal of the

lawsuit he brought against his former employer, Kennecott Corporation

("Kennecott") and several other defendants.  Winkel had been employed by

Kennecott for approximately thirty years before his retirement in early 1997.

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Shortly after Winkel left his job, Kennecott publicly announced the adoption of an involuntary employee benefit plan (the "Severance Plan"). Although individuals chosen by Kennecott to participate in the Severance Plan were terminated, each received a severance package more generous than that which Winkel received. Winkel attempted to return to his job in an effort to have the opportunity to be chosen as a participant in the Severance Plan. Kennecott, however, refused to allow Winkel to return to his job and turned down his written request to be included as a participant in the Severance Plan.

Winkel brought this suit alleging Defendants breached a fiduciary duty owed to him under the Employee Retirement Income Security Act ("ERISA") by not disclosing to him that they were considering adopting the Severance Plan. Winkel also alleged Defendants breached a fiduciary duty owed him by failing to inform him that his election to retire was irrevocable. Finally, Winkel claimed Defendants interfered with his attainment of rights under the Severance Plan when they refused to allow him to rescind his retirement decision and return to work.

The district court granted summary judgment in favor of Defendants on all of Winkel's claims. *See Winkel v. Kennecott Holdings Corp.*, 48 F. Supp. 2d 1294, 1303 (D. Utah 1999). The district court, however, awarded a statutory penalty to Winkel for the plan administrator's failure to provide Winkel with a

copy of the Severance Plan. *See id.* The district court then denied Winkel's request for attorneys' fees related to his claim for the statutory penalty. Winkel appeals the grant of summary judgment in favor of Defendants; defendant, Alan Stuyvesant, cross-appeals the award of the statutory penalty to Winkel; and Winkel appeals the denial of his request for attorneys' fees. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the grant of summary judgment in favor of Defendants, **affirm** the award of the statutory penalty to Winkel, and **affirm** the denial of Winkel's motion for attorneys' fees.

## II. FACTUAL BACKGROUND

### A. *The Reorganization*

Prior to Winkel's retirement, Kennecott's parent company, RTZ Corporation PLC, entered into a dual company listed merger with CRA Limited, an Australian company. The combined company was referred to as RTZ/CRA. After June 1997, the company was known as Rio Tinto. Winkel's claims stem from RTZ/CRA's decision to close Kennecott's corporate headquarters in Salt Lake City as part of a reorganization of Kennecott's operations. In January 1997, RTZ/CRA designated Jonathan Leslie as the individual responsible for reorganizing Kennecott's operations in the United States. Leslie was informed that the restructuring would likely involve closing Kennecott's Salt Lake City corporate headquarters. Leslie was charged, *inter alia*, with investigating the

feasibility and cost of offering a severance package to Kennecott employees whose positions would be eliminated as a result of the reorganization. Leslie understood that any information relating to the proposed reorganization was confidential.

Leslie traveled to Salt Lake City and met with Tracy Stevenson, Kennecott's chief financial officer, on February 17, 1997. Leslie informed Stevenson of the impending reorganization and Stevenson recommended that two other Kennecott executives, Richard Pierce and Ron Skaer, be notified. Pierce was Senior Vice President, Law and General Counsel and Skaer was Senior Vice President, Human Resources. Between February 17 and February 25, Leslie and Stevenson discussed the "range of severance benefits" that had been offered to Kennecott employees in the past and the elements of Kennecott's existing reduction-in-force policy. On or about February 24, Stevenson contacted Kwasha Lipton, Kennecott's actuaries, and requested that they estimate the cost to provide several different severance packages to terminated Kennecott employees.

On February 26, 1997, a meeting was held in New York City for the purpose of discussing the reorganization. In his deposition, Pierce testified that the decision was made at the meeting to develop a new severance plan but that the specific terms of the plan were not discussed. Pierce's recollection was that "[t]he only discussion under the terms was kind of a general view that

[Stevenson] and I express[ed] that . . . it would be nice if we could be more generous than what the existing . . . policy called for. But other than that there weren't any discussions on the terms." At the time of the New York meeting, Kwasha Lipton had not yet responded to Stevenson's request for information on the cost to provide alternative levels of severance benefits to terminated employees.

On March 2, 1997, the reorganization was discussed at a meeting held in Salt Lake City. The meeting was attended by Leslie, Pierce, Skaer, Stevenson, and two additional members of Kennecott's executive committee. Notes made at the March 2 meeting by Skaer indicate that the terms of the proposed severance plan were discussed in some detail. Skaer's notes also state that cost information had still not been received from Kwasha Lipton.

After the March 2 meeting, Kennecott's managers began assessing the staffing requirements of the reorganized company. The cost information was received from Kwasha Lipton on March 6, 1997. Stevenson testified in his deposition that he discussed the specific terms of the severance package with Leslie on March 12, and Leslie "concurre[d] that this was the -- these were the terms that we were going to run with in having Kwasha [Lipton] prepare final calculations."

Kennecott's reorganization was publicly announced on March 18, 1997, the same day the Severance Plan was adopted and the reduction-in-force was communicated to Kennecott employees.  Pursuant to the express terms of the Severance Plan, plan participants included only those employees who received a termination notice from Kennecott stating "that his or her employment is being terminated and that he or she is a Participant in the Plan."

## B.  *Winkel's Retirement*

Winkel was employed by Kennecott for approximately thirty years.  In November 1996, Winkel began contemplating retirement.  According to Winkel, he sent an electronic message to Debbie Kawaguchi, Kennecott's Benefits Manager, in January 1997, stating "that I was turning in my resignation as a means of retiring."  Kawaguchi informed Winkel that he could increase his retirement benefit by using his accrued vacation time.  Based on Kawaguchi's suggestion, Winkel decided to take five weeks of accrued vacation time and changed the effective date of his retirement from March 1, 1997 to April 1, 1997.  After he submitted the electronic mail message to Kawaguchi, Winkel asked both his immediate supervisor, Jim MacKay, and MacKay's superior, Neil MacArthur, if Kennecott was considering any severance packages that would enhance his retirement benefits.  Winkel testified that he questioned MacArthur in January, 1997, and posed a similar inquiry to MacKay in "mid February."  Both MacKay

and MacArthur truthfully answered that they were not aware of any such program. Winkel concedes that he never asked Kawaguchi if Kennecott was considering any changes to its benefit plans.

Winkel's last day of work was February 25, 1997. On that day Winkel attended a retirement luncheon held for his benefit, removed his personal property from his work area, and returned his company keys. Kawaguchi had sent Winkel a letter and a packet of forms relating to his retirement elections on February 13, 1997. Winkel signed the election forms and returned them to Kawaguchi on March 14. Prior to Winkel's last day of work, Kennecott had hired Curtis Lefler to replace him.

Winkel learned of the Severance Plan on March 18, the day it was adopted. On March 19, 1997, Winkel telephoned Kawaguchi and also sent her a letter indicating he intended to rescind his retirement, cancel the remainder of his vacation, and return to work on March 24. Winkel sent a copy of the letter to defendant, Alan Stuyvesant, Kennecott's Benefits Director and the plan administrator of the Severance Plan. In the letter to Stuyvesant, Winkel also stated, "I would assume that I [will] be an eligible candidate to receive the benefits accorded those individuals to be terminated." Winkel attempted to return to work on March 24, but MacArthur informed him that his position was no longer available. On April 22, Stuyvesant sent Winkel a letter stating that he was

not eligible to participate in the Severance Plan because he had not been selected for termination. The letter also denied Winkel's request to return to work stating, "Once the Company accepted your resignation, it was not obligated to accept your withdrawal of that resignation."

Winkel's counsel sent a letter to Stuyvesant on May 6, 1997, requesting copies of Severance Plan documents. Stuyvesant responded with a letter denying the request. Stuyvesant failed to respond to a second request for the documents.

## III. DISCUSSION

### Appeal No. 99-4114

#### A. *Standard of Review*

This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court. *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999). Under that standard, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When determining whether a genuine issue of material facts exists, all "justifiable inferences" are drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

#### B. *Standing*

In their motion for summary judgment, Defendants argued that Winkel does not have standing to bring any of his claims. The district court addressed the issue and concluded that Winkel does have standing. *See Winkel*, 48 F. Supp. 2d at 1300. Although Defendants do not challenge the district court's conclusion in this appeal, this court may address the issue *sua sponte*. *See Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 492 (10th Cir. 1998). We are, however, in substantial agreement with the district court's resolution of the standing issue and thus proceed to the merits. *See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 514-15 (1997); *Winkel*, 48 F. Supp. 2d at 1300.

### C. Kennecott's Fiduciary Duties With Respect to the Severance Plan

In addition to containing express disclosure and reporting requirements, ERISA imposes a general fiduciary duty on plan administrators. *See* 29 U.S.C. § 1104; *see also Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996) ("[T]he primary function of the fiduciary duty is to constrain the exercise of discretionary powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime."). The parties do not dispute that the Severance Plan is covered by ERISA. The sole issue dividing the parties is whether Defendants had a fiduciary duty to provide Winkel with information about the Severance Plan. Winkel contends Defendants breached their fiduciary duty to him with material misrepresentations and omissions concerning the Severance Plan.

This court has adopted the "serious consideration" test first articulated by the Eleventh Circuit in *Barnes v. Lacy*, 927 F.2d 539, 544 (11th. Cir. 1991), and later adopted by several other Circuit Courts of Appeal. *See Hockett v. Sun Co., Inc.*, 109 F.3d 1515, 1522-25 (10th Cir. 1997); *Maez v. Mountain States Tel. & Tel., Inc.*, 54 F.3d 1488, 1500 (10th Cir. 1995); *see also Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1048-49 (9th Cir. 2000) (en banc); *Muse v. Int'l Bus. Machs. Corp.*, 103 F.3d 490, 495 (6th Cir. 1996); *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir. 1995); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 702 (1st Cir. 1994). The purpose of the serious consideration test is to "balance the

-11-

tension between an employee's right to information and an employer's need to operate on a day-to-day basis." *Hockett*, 109 F.3d at 1522 (quotation omitted). Under the test, no fiduciary obligation to disclose the existence or contemplated existence of an ERISA plan or any contemplated changes to an existing plan arises until such plan or such changes come under serious consideration. *See Hockett*, 109 F.3d at 1522. Thus, to maintain a claim for breach of fiduciary duty based on misrepresentations made by a plan administrator, the proposed plan must have been under serious consideration at the time the alleged misrepresentations were made. *See id.*

Defendants first argue that the serious consideration test is inapplicable to involuntary plans like the Severance Plan. Winkel argues that both voluntary and involuntary plans must be analyzed by applying the serious consideration test. Because Winkel is not entitled to relief even if the serious consideration test is applied, it is unnecessary for this court to address Defendants' argument.[1]

---

[1]Although it is unnecessary for this court to address this issue, we note that this case illustrates why the serious consideration test should be applicable even when the plan is involuntary. Although Kennecott retained unfettered discretion to determine who would participate in the Severance Plan, it is undeniable that Winkel may have altered the timing of his retirement if he had been aware that the Severance Plan would be adopted. Thus, the balancing of an employer's need for privacy with an employee's need for information which forms the basis of the serious consideration test, is relevant even when the contemplated plan is involuntary. Additionally, because we conclude, *infra*, that the Severance Plan was not under serious consideration until after Winkel's retirement, it is unnecessary for this court to reach the question of whether Defendants had an

The serious consideration test was discussed extensively in *Fischer v. Philadelphia Electric Co.*, 96 F.3d 1533, 1538 (3d Cir. 1996) ("*Fischer II*"). Three factors were identified as being determinative of whether a plan is under serious consideration: "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id*. at 1539. *Fischer II* contains a comprehensive analysis of the three separate factors and this court has specifically adopted those factors. *See Hockett*, 108 F.3d at 1523-24. The first factor, the requirement of a "specific proposal," does not occur until the plan administrator has *completed* the preliminary steps of "gathering information, developing strategies, and analyzing options." *Fischer II*, 96 F.3d at 1539-40. Thus, a specific proposal must contain sufficient information on which management can rely in basing its decision. That proposal may contain several alternatives and each alternative may thereafter change slightly, but the basic components of each alternative must be sufficiently clear or the first factor is not satisfied.

---

affirmative duty to communicate information to Winkel once the Severance Plan came under serious consideration. It is also unnecessary to address Defendants' assertion that the individuals to whom Winkel addressed his inquiries did not qualify as plan fiduciaries. *See Varity Corp. v. Howe*, 516 U.S. 489, 503 (1996) (holding defendants responsible for misrepresentations made by "those within the firm who had authority to communicate as fiduciaries with plan beneficiaries").

The second factor requires that the proposal be under discussion for purposes of implementation. Even if a specific proposal has been prepared at management's request, the second factor is not satisfied until "the subject turns to the practicalities of implementation." *Id*. at 1540. The third factor further refines the second factor. Under the third factor, the specific proposal must be under discussion by "senior management with the authority to implement the change." *Id*. When all three of these factors intersect, a plan has come under serious consideration and any material misrepresentations made after this time constitute a breach of the plan administrator's fiduciary duty. *See Hockett* , 109 F.3d at 1523.

After applying the serious consideration elements to the facts in this case, it is evident that the Severance Plan was not under serious consideration until some time after February 25, 1997, Winkel's last day of work. Winkel argues that serious consideration occurred by January 28, 1997, because at that time, "Leslie and Albanese had decided that there would be a restructuring and that there would be a severance package for terminated employees." Winkel concedes, however, that no agreement was reached on the terms of the Severance Plan until after January 28.

Winkel has not introduced any evidence from which a reasonable jury could conclude that prior to February 26, a specific proposal was being discussed for

purposes of implementation by senior management with the authority to implement the change. The admissible evidence indicates that, until the February 26, 1997 meeting in New York, the severance terms had been discussed by Leslie and Stevenson only in a cursory fashion. Stevenson testified that those discussions centered around the benefits that Kennecott had offered in the past. Even assuming that Stevenson's request for cost information from Kwasha Lipton manifested Kennecott's consideration of four alternative severance options, the information necessary to meaningfully discuss those options was not received until after February 25. *See Hockett*, 109 F.3d at 1525 ("While cost-analysis or actuarial work is not a necessary prerequisite to serious consideration, it is unlikely that a specific proposal would be 'sufficiently concrete' without some such information."). Even construed in the light most favorable to Winkel, the evidence demonstrates that on February 25, Defendants were still engaged in the "preliminary steps of gathering data and formulating strategy." *Id*. at 1524.

Winkel has also failed to introduce any evidence indicating that the logistics of implementing the Severance Plan were discussed by Kennecott executives prior to February 26. Those discussions did not occur until the March 2 meeting in Salt Lake City. The admissible evidence also does not support Winkel's contention that the third factor of the serious consideration test was met when Leslie was given the unilateral authority to implement the Severance Plan.

-15-

The uncontroverted evidence clearly demonstrates that Leslie actively sought input from several Kennecott executives before making any decisions on the terms and implementation of the Severance Plan.

It is unnecessary for this court to determine the exact date on which the Severance Plan came under serious consideration, however, because on February 25, 1997, Winkel left his job at Kennecott and his retirement decision was irrevocable. Although the effective date of Winkel's retirement was April 1, 1997, Winkel had unequivocally communicated to Kennecott his decision to retire and, in reliance on that communication, Kennecott had hired a replacement to fill the position Winkel vacated on February 25. Additionally, Winkel had cleaned out his desk, turned in his company keys, and had no intention to return to work. Winkel's decision to retire became irrevocable before the Severance Plan was seriously considered. Thus, any statements made by Defendants, including the statements made by MacArthur and MacKay in response to Winkel's inquiries, did not constitute a breach of Defendants' fiduciary duty. Because Winkel has failed to demonstrate that the Severance Plan was under serious consideration at any time before he vacated his job at Kennecott, Winkel's claim fails.

### D.     *Failure to Notify Winkel that His Retirement Election was Irrevocable*

Winkel next asserts that Defendants breached a fiduciary duty owed him under ERISA when it failed to notify him that his election to retire was

irrevocable. In support of his argument, Winkel relies on a case in which the Third Circuit addressed the question of whether a plan administrator breaches a fiduciary duty when it fails to inform a plan participant that elections made by the participant are irrevocable. *See Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1017 (3d Cir. 1997). In *Jordan*, the plaintiff was not informed that a decision he made with respect to the distribution of plan benefits could not be revoked. *See id*. at 1014, 1017. Although the ERISA plans at issue in *Jordan* expressly stated that the elections made by the plaintiff were irrevocable, the plaintiff was not provided with copies of the plan documents. *See id*. at 1016. The plan administrator did not inform the plaintiff that his elections were irrevocable. *See id*. at 1014, 1017.

Winkel was a participant in two Kennecott pension plans, the Retirement Accumulation Plan ("RAP") and the Savings and Investment Plan ("SIP").[2] At the time of his retirement, Winkel made certain elections relating to monies held for his benefit in the RAP. Winkel has identified no provision in either the RAP, the SIP, or the Severance Plan that addresses the revocability of his retirement election. Additionally, Winkel, does *not* assert that the breach of fiduciary duty

---

[2]The plan administrator of the RAP was the Senior Vice President, Human Resource for defendant, Kennecott Holdings. The same individual, together with a committee comprised of at least three people, were the plan administrators of the SIP. Defendant Alan Stuyvesant was the plan administrator of the Severance Plan.

arose from Defendants' failure to inform him that the RAP elections he made were irrevocable. Thus, *Jordan* is wholly inapposite because Winkel has not offered any evidence supporting a claim that Defendants failed to notify him of an express provision contained in an ERISA plan.

The other cases cited by Winkel in support of his claim involve a plan administrator's fiduciary duty to inform a plan participant of a plan benefit to which that participant was entitled. *See, e.g.*, *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993)*; Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 749 (D.C. Cir. 1990). Both the SIP and the RAP, however, expressly state that the plans do not create any employment rights and the Severance Plan is silent on this issue. Winkel himself concedes that the plans are silent with respect to the revocability of his retirement election.

Winkel's claim is limited solely to the contention that Defendants had a fiduciary duty to inform him that his election to retire was irrevocable. Winkel has not identified any provision in the RAP or the SIP that confers any *employment* benefits on him by virtue of his status as a plan participant. Likewise, Winkel has identified no case in which it was held that ERISA imposes a free-floating fiduciary duty on plan administrators to notify plan participants of

the irrevocability of employment decisions.[3]  The decision to not allow Winkel to return to work was made by Kennecott in its capacity as Winkel's employer.  As such, it was a personnel decision not governed by ERISA and not subject to any fiduciary duty imposed on plan administrators by ERISA.

### E.    Section 510 Claim

As his final claim, Winkel alleges that Defendants interfered with his right to receive benefits under the Severance Plan by refusing to allow him to rescind his retirement election and return to work.  Winkel contends that if Defendants had allowed him to return to work, he would have been chosen to participate in the Severance Plan.  Thus, Winkel argues, Defendants' failure to allow him to return to work interfered with his attainment of a right to receive Severance Plan benefits.[4]

ERISA § 510, codified at 29 U.S.C. § 1140 ("section 510"), precludes any person, *inter alia*, from discharging or otherwise discriminating against a plan participant "for the purpose of interfering with the attainment of any right to

---

[3]Winkel's reliance on *Varity* is misplaced because no reasonable employee in Winkel's position could have thought that Kennecott was communicating to him in its capacity as a plan administrator when it informed him that he could not return to work.  *See Varity Corp.*, 516 U.S. at 503.

[4]Winkel's appellate briefs contain veiled references to Defendants' interference with his right to continue to receive benefits under the RAP and the SIP.  Because Winkel's argument is not fully developed, we decline to address it. *See Phillips v. Calhoun*, 956 F.2d 949, 953 (10th Cir. 1992).

which such participant may become entitled under the plan." 29 U.S.C. § 1140. To prevail under section 510, an employee must demonstrate that the defendant had the specific intent to interfere with his ERISA rights. *See Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993). The employee can satisfy his burden by relying on either direct or circumstantial proof of the defendant's intent. *See Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998) (en banc). Winkel has chosen to produce circumstantial evidence of Defendants' intent by employing the well-known, burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Gitlitz v. Compagnie Nationale Air Fr.*, 129 F.3d 554, 559 (11th Cir. 1997) (applying the *McDonnell Douglas* analysis to a section 510 claim); *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3rd Cir. 1987) (same) (cited with approval in *Garratt*, 164 F.3d at 1256). Defendants have not challenged Winkel's use of the *McDonnell Douglas* framework and this court, therefore, will analyze Winkel's claim using that approach.[5]

Under the *McDonnell Douglas* method, the plaintiff must first establish a prima facie case of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S. Ct. 2097, 2106 (2000). Once the plaintiff has met that burden, the

---

[5]Because the application of *McDonnell Douglas* is not challenged, this court need not address the propriety of its application.

burden shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for its conduct. *See id*. The defendant's burden at the second stage of the *McDonnell Douglas* analysis is one of production, *not* one of persuasion. *See id*. The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. *See id*. Thus, under the *McDonnell Douglas* framework, the burden of production shifts from plaintiff to defendant and back to plaintiff. The plaintiff, however, bears the ultimate burden of proving that the defendant's discriminatory actions were intentional. *See id*.

Defendants do not allege that Winkel has failed to establish a prima facie case of intent to interfere with ERISA rights. Defendants contend Winkel was not allowed to return to the position he vacated on February 25, 1997, because another individual had already been hired to fill that position and, therefore, no job was available for Winkel. Defendants then argue Winkel has failed to demonstrate that this proffered explanation is pretextual.

Winkel's attempt to demonstrate that Defendants' explanation is a pretext for interference with ERISA rights consists first of the argument that Defendants have failed to substantiate their proffered explanation because they have produced only one "lone piece of evidence that Lefler 'replaced'" him. Although it is Winkel who invokes the *McDonnell Douglas* approach, it is Winkel who misconstrues it. We reiterate that the defendant merely has to present admissible

evidence of a legitimate reason for its conduct. Its burden is that of production, not persuasion, and the truthfulness of its proffered explanation is assumed. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Although a defendant is not precluded from substantiating its explanation, the defendant's sole burden at the second stage of the *McDonnell Douglas* analysis is to simply articulate a reason. *See id.* at 509-10. The plaintiff bears the burden of demonstrating that the proffered explanation is pretextual. *See Reeves*, 120 S. Ct. at 2106.

Notwithstanding Winkel's misplaced assertion that Defendants bear the burden of introducing evidence to support the proffered explanation, the record contains uncontroverted documentary evidence[6] that supports Defendants' explanation. This evidence includes an Employment Requisition Form executed by MacKay in which authorization is requested to hire a full-time senior systems analyst as a "[r]eplacement for Tom Winkel." The record also includes a document entitled Personnel Action Record in which Lefler's name is listed as the "[r]eplacement for Tom Winkel who is retiring." Not only do these two documents substantiate Defendants' contention that Lefler filled a budgeted vacancy created when Winkle retired, but, in addition, MacKay, MacArthur, and Stevenson all testified that Lefler was hired to replace Winkel.

---

[6]Although Winkel implies that these documents were prepared under suspicious circumstances, he has introduced no evidence to substantiate his allegations.

In support of his claim that Defendants' proffered explanation is pretextual, Winkel first claims that Lefler did not "replace" him because Lefler did not perform the identical job duties Winkel was performing at the time of his retirement. The role of this court is only to determine whether Defendants' refusal to allow Winkel to return is a pretext for impermissible interference with ERISA rights; we will not second-guess Kennecott's decision as to what projects or tasks should be assigned to Winkel's replacement. *See Simms v. Okla. Dep't of Mental Health*, 165 F.3d 1321, 1330 (10th Cir. 1999) (stating this court is not "a super personnel department that second guesses employers' [lawful] business judgments") (quotation omitted).

In his reply brief, Winkel argues that because he would have been eligible for enhanced benefits if he had been selected to participate in the Severance Plan, a reasonable jury could draw the inference that Defendants necessarily were motivated by a desire to interfere with his right to attain Severance Plan benefits in violation of section 510. Winkel's conclusory assertion is unsupported by any admissible evidence and is, therefore, insufficient to satisfy his burden at the third stage of the *McDonnell Douglas* analysis. *See Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1418 (10th Cir. 1993).

Winkel also notes that Kennecott's organizational chart, dated March 1997, reflects a vacancy for a Senior Systems Specialist, the title of the position Winkel

held before his retirement. Winkel claims this document supports his assertion that Defendants' articulated explanation is pretextual because at the time Winkel attempted to return to work there was a position for him. Aside from simply noting that the vacant position and the position he formerly occupied share the same job title, Winkel has not offered any evidence that the two jobs were identical or substantially similar. In fact, the vacant position occupies a higher level on the organizational chart than the position vacated by Winkel. Thus, Winkel has not supported his assertion with any evidence from which a jury could infer pretext.

We have reviewed all of Winkel's assertions and conclude that he has failed to introduce any evidence from which a reasonable jury could conclude that Defendants' proffered explanation is pretextual.[7] Winkel's section 501 claim, therefore, fails.

### F.    Conclusion

This court concludes that the district court properly granted summary judgment in favor of Defendants on all claims raised by Winkel. The decision of the district court is, therefore, **affirmed**.

---

[7]Some of Winkel's arguments, including his argument that he could have filled one of approximately eighty vacancies created by the reduction-in-force, do not merit discussion.

The district court also concluded that defendant Stuyvesant violated 29 U.S.C. § 1024(b)(4) by failing to provide Winkel, upon request, with a copy of the Severance Plan documents. The court awarded Winkel a penalty in the amount of $4625.00 pursuant to 29 U.S.C. § 1132(c). Ordinarily, "[a] district court's assessment of, or refusal to assess, penalties under 29 U.S.C. § 1132(c) is reviewed for an abuse of discretion." *Deboard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000). The district court's discretionary decision to award the § 1132(c) penalty to Winkel, however, was predicated on the court's conclusion that Winkel was a plan participant at the time of his request. In this appeal, Stuyvesant argues only that the district court erred when it concluded Winkel was a plan participant as that term is defined in 29 U.S.C. § 1002(7). This appeal, therefore, involves only a question of law that this court reviews *de novo*. *Cf. Burrey v. Pacific Gas & Elec. Co.*, 159 F.3d 388, 391 (9th Cir. 1998).

After reviewing the parties' briefs and conducting a *de novo* review of the record, this court concludes that the district court correctly decided this issue. Although we conclude, *supra*, that the district court properly granted summary judgment to Defendants on Winkel's ERISA claims, Winkel's claims were not frivolous. At the time Winkel requested the Severance Plan documents, therefore,

he was a former employee with a colorable claim that he would "prevail in a suit for benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989). Therefore, Winkel was a plan participant as that term is defined by 29 U.S.C. § 1002(7). Accordingly, for substantially the same reasons set out in the district court's Memorandum Decision and Order dated April 27, 1999, the judgment of the district court awarding a penalty of $4625.00 to Winkel is **affirmed**.

**Appeal No. 99-4150**

On May 29, 1999, Winkel filed a motion with the district court seeking attorneys' fees related to his successful ERISA penalty claim against defendant Stuyvesant. The district court denied the motion and Winkel brought this appeal. This court reviews the denial of a motion for attorneys' fees under ERISA for an abuse of discretion. *See Deboard*, 208 F.3d at 1244. We have reviewed the record on appeal, and conclude that the district court did not abuse its discretion when it refused to award attorneys' fees to Winkel.

Generally, a district court should consider the following factors when determining whether to award attorneys' fees under ERISA: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to personally satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all

participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions." *Gordon v. United States Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983). Winkel first argues that the district court erred because it considered a factor not permitted by *Gordon*. Winkel's argument fails for two reasons. First, this court has clearly stated that the list of five factors is "nonexclusive" and should be considered "among other[]" factors. *Deboard*, 208 F.3d at 1244; *Thorpe v. Ret. Plan of the Pillsbury Co.*, 80 F.3d 439, 445 (10th Cir. 1996); *Gordon*, 724 F.2d at 109. Thus, the district court is not categorically prohibited from considering a factor not specifically articulated in *Gordon*.

More importantly, however, Winkel mischaracterizes the district court's statement upon which his argument is based. The court stated, "the deterrent purposes that would be served by granting [Winkel's] motion were previously taken into consideration by this Court in fixing the amount of the *§ 1132(c)* penalty." Winkel contends that the district court's statement evinces the court's consideration of the *fact* that the § 1132(c) penalty was awarded. Winkel then argues that the district court's ruling essentially forecloses him from recovering both the § 1132(c) penalty and attorneys' fees. It is clear from the district court's statement, however, that the court considered only the *amount* of the § 1132(c) penalty awarded to Winkel. Thus, the court's statement is nothing more than an

articulation of its conclusion that the third *Gordon* factor weighed against an award of attorneys' fees because the amount of the § 1132(c) penalty provided a sufficient deterrent to others. *See Gordon*, 724 F.2d at 109 (listing as the third factor "whether an award of attorney's fees against the opposing parties would deter others from acting under similar circumstances").

Winkel also argues that the district court abused its discretion because it failed to weigh each of the five factors. The district court, however, specifically stated in its order that it had considered both the factors and the arguments of the parties in reaching its decision to deny Winkel's motion. The briefs filed by the parties both in support of and in opposition to Winkel's motion for fees address the five *Gordon* factors in detail. In regard to the first factor, Winkel argued that Stuyvesant's failure to provide him with the Severance Plan documents could not "have been motivated by anything other than bad faith." The record, however, clearly supports Stuyvesant's argument that there was considerable uncertainty over whether Winkel was a participant in the Severance Plan. In fact, Winkel's status as a plan participant was not finally determined until the district court ruled that he had standing to bring his claims. *See Winkel*, 48 F. Supp. 2d at 1299-1300.

With respect to the second factor, neither party contested that Stuyvesant has the ability to satisfy an award of attorneys' fees. As discussed *supra*, the

district court explicitly concluded that the third factor weighs in favor of Stuyvesant. It is also uncontested that the fourth factor does not weigh in favor of Winkel. As Winkel stated in his brief to the district court, "[t]he fourth factor . . . is not applicable to this case." The fifth factor, the relative merits of the parties' positions, is related to the first factor (bad faith). As discussed *supra*, although Winkel ultimately prevailed on his claim, Stuyvesant's position did not lack merit and was only resolved by analyzing two recent Supreme Court decisions. Thus, the fifth factor weighs in favor of Stuyvesant.

Accordingly, the district court did not abuse its discretion when it concluded that Winkel was not entitled to attorneys' fees. The district court's order denying Winkel's motion for attorneys' fees is therefore **affirmed**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge