# INTER-MODAL RAIL EMPLOYEES ASSOCIATION ET AL. *v.* ATCHISON, TOPEKA & SANTA FE RAILWAY CO., ET AL.

No. 96–491.   Argued March 17, 1997—Decided May 12, 1997

*Richard E. Schwartz* argued the cause for petitioners. With him on the briefs was *James E. Parrot.*

*Cornelia T. L. Pillard* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Kneedler, J. Davitt McAteer, Allen H. Feldman,* and *Mark S. Flynn.*

*James D. Holzhauer* argued the cause for respondents. With him on the brief for respondents Atchison, Topeka & Santa Fe Railway Co. et al. was *Alan E. Untereiner. Patrick W. Jordan* and *Robin M. Schachter* filed a brief for respondent In-Terminal Services.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Section 510 of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 895, makes it unlawful to

---

*\*Mary Ellen Signorille, Melvin Radowitz,* and *Ronald Dean* filed a brief for the American Association of Retired Persons et al. as *amici curiae* urging reversal.

*Robert N. Eccles, Karen M. Wahle, Jan S. Amundson, Quentin Riegel, Robert W. Blanchette,* and *Kenneth P. Kolson* filed a brief for the Employers Group et al. as *amici curiae* urging affirmance.

"discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary [of an employee benefit plan] for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U. S. C. § 1140. The Court of Appeals for the Ninth Circuit held that § 510 only prohibits interference with the attainment of rights that are capable of "vesting," as that term is defined in ERISA. We disagree.

## I

The individual petitioners are former employees of respondent Santa Fe Terminal Services, Inc. (SFTS), a wholly owned subsidiary of respondent The Atchison, Topeka and Santa Fe Railway Co. (ATSF), which was responsible for transferring cargo between railcars and trucks at ATSF's Hobart Yard in Los Angeles, California. While petitioners were employed by SFTS, they were entitled to retirement benefits under the Railroad Retirement Act of 1974, 88 Stat. 1312, as amended, 45 U. S. C. § 231 *et seq.*, and to pension, health, and welfare benefits under collective bargaining agreements involving SFTS and the Teamsters Union. SFTS provided its workers with pension, health, and welfare benefits through employee benefit plans subject to ERISA's comprehensive regulations.

In January 1990, ATSF entered into a formal "Service Agreement" with SFTS to have SFTS do the same "intermodal" work it had done at the Hobart Yard for the previous 15 years without a contract. Seven weeks later, ATSF exercised its right to terminate the newly formed agreement and opened up the Hobart Yard work for competitive bidding. Respondent In-Terminal Services (ITS) was the successful bidder, and SFTS employees who declined to continue employment with ITS were terminated. ITS, unlike SFTS, was not obligated to make contributions to the Railroad Retirement Account under the Railroad Retirement Act. ITS also provided fewer pension and welfare benefits under its

collective bargaining agreement with the Teamsters Union than had SFTS. Workers who continued their employment with ITS "lost their Railroad Retirement Act benefits" and "suffered a substantial reduction in Teamsters benefits." 80 F. 3d 348, 350 (CA9 1996) *(per curiam).*

Petitioners sued respondents SFTS, ATSF, and ITS in the United States District Court for the Central District of California, alleging that respondents had violated § 510 of ERISA by "discharg[ing]" petitioners "for the purpose of interfering with the attainment of . . . right[s] to which" they would have "become entitled" under the ERISA pension and welfare plans adopted pursuant to the SFTS-Teamsters collective bargaining agreement. See App. to Pet. for Cert. 29a, Complaint ¶ 33. Had SFTS remained their employer, petitioners contended, they would have been entitled to assert claims for benefits under the SFTS-Teamsters benefit plans, at least until the collective bargaining agreement that gave rise to those plans expired. The substitution of ITS for SFTS, however, precluded them from asserting those claims and relegated them to asserting claims under the less generous ITS-Teamsters benefit plans. According to petitioners, the substitution "interfer[ed] with the attainment" of their "right" to assert those claims and violated § 510. Respondents moved to dismiss these § 510 claims, and the District Court granted the motion.

The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. 80 F. 3d 348 (1996). The court reinstated petitioners' claim under § 510 for interference with their *pension* benefits, concluding that § 510 " 'protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting.' " *Id.*, at 350–351 (quoting *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 143 (1990)). But the Court of Appeals affirmed the dismissal of petitioners' claim for interference with their *welfare* benefits. "Unlike pension benefits," the Court of Appeals observed, "welfare benefits do not vest." 80 F. 3d, at

351. As a result, the Court of Appeals noted, "employers remain free to unilaterally amend or eliminate [welfare] plans," and "employees have no present 'right' to future, anticipated welfare benefits.'" *Ibid.* (emphasis deleted; internal quotation marks omitted). Because the "existence of a present 'right' is [a] prerequisite to section 510 relief," the Court of Appeals concluded that § 510 did not state a cause of action for interference with welfare benefits. *Ibid.* We granted certiorari to resolve a conflict among the Courts of Appeals on this issue,* 519 U. S. 1003 (1996), and now vacate the decision below and remand.

## II

The Court of Appeals' holding that § 510 bars interference only with vested rights is contradicted by the plain language of § 510. As noted above, that section makes it unlawful to "discharge . . . a [plan] participant or beneficiary . . . for the purpose of interfering with the *attainment of any right* to which such participant may become entitled under *the plan.*" 29 U. S. C. § 1140 (emphasis added). ERISA defines a "plan" to include both "an employee welfare benefit plan [and] an employee pension benefit plan," § 1002(3), and specifically exempts "employee welfare benefit plan[s]" from its stringent vesting requirements, see § 1051(1). Because a "plan" includes an "employee welfare benefit plan," and because welfare plans offer benefits that do not "vest" (at least insofar as ERISA is concerned), Congress' use of the word "plan" in § 510 all but forecloses the argument that § 510's interfer-

---

*See *Shahid* v. *Ford Motor Co.,* 76 F. 3d 1404, 1411 (CA6 1996) (holding that § 510 draws no distinction between benefits that vest and those that do not); *Heath* v. *Varity Corp.,* 71 F. 3d 256, 258 (CA7 1995) (same); *Seaman* v. *Arvida Realty Sales,* 985 F. 2d 543, 546 (CA11) (same), cert. denied, 510 U. S. 916 (1993); see also *McGann* v. *H & H Music Co.,* 946 F. 2d 401, 408 (CA5 1991) (implying the same), cert. denied *sub nom. Greenburg* v. *H & H Music Co.,* 506 U. S. 981 (1992); *Andes* v. *Ford Motor Co.,* 70 F. 3d 1332, 1336 (CADC 1995) (implying the same).

ence clause applies only to "vested" rights. Had Congress intended to confine § 510's protection to "vested" rights, it could have easily substituted the term "pension plan," see 29 U. S. C. § 1002(2), for "plan," or the term "nonforfeitable" right, see § 1002(19), for "any right." But § 510 draws no distinction between those rights that "vest" under ERISA and those that do not.

The right that an employer or plan sponsor may enjoy in some circumstances to unilaterally amend or eliminate its welfare benefit plan does not, as the Court of Appeals apparently thought, justify a departure from § 510's plain language. It is true that ERISA itself "does not regulate the substantive content of welfare-benefit plans." *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 732 (1985). Thus, unless an employer contractually cedes its freedom, see, *e. g.*, *Adcox* v. *Teledyne, Inc.*, 21 F. 3d 1381, 1389 (CA6), cert. denied, 513 U. S. 871 (1994), it is "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate [its] welfare pla[n]." *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U. S. 73, 78 (1995).

The flexibility an employer enjoys to amend or eliminate its welfare plan is not an accident; Congress recognized that "requir[ing] the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans." S. Rep. No. 93–383, p. 51 (1973). Giving employers this flexibility also encourages them to offer more generous benefits at the outset, since they are free to reduce benefits should economic conditions sour. If employers were locked into the plans they initially offered, "they would err initially on the side of omission." *Heath* v. *Varity Corp.*, 71 F. 3d 256, 258 (CA7 1995). Section 510 counterbalances this flexibility by ensuring that employers do not "circumvent the provision of promised benefits." *Ingersoll-Rand Co., supra*, at 143 (citing S. Rep. No. 93–127, pp. 35–36 (1973); H. R. Rep. No. 93–533, p. 17 (1973)). In short, "§ 510 helps to make promises credible." *Heath, supra*, at 258. An employer

may, of course, retain the unfettered right to alter its promises, but to do so it must follow the formal procedures set forth in the plan. See 29 U. S. C. § 1102(b)(3) (requiring plan to "provide a procedure for amending such plan"); *Schoonejongen, supra,* at 78 (observing that the "cognizable claim [under ERISA] is that the company did not [amend its welfare benefit plan] in a permissible manner"). Adherence to these formal procedures "increases the likelihood that proposed plan amendments, which are fairly serious events, are recognized as such and given the special consideration they deserve." *Schoonejongen, supra,* at 82. The formal amendment process would be undermined if § 510 did not apply because employers could "informally" amend their plans one participant at a time. Thus, the power to amend or abolish a welfare benefit plan does not include the power to "discharge, fine, suspend, expel, discipline, or discriminate against" the plan's participants and beneficiaries "for the purpose of interfering with [their] attainment of . . . right[s] . . . under the plan." To be sure, when an employer acts without this purpose, as could be the case when making fundamental business decisions, such actions are not barred by § 510. But in the case where an employer acts with a purpose that triggers the protection of § 510, any tension that might exist between an employer's power to amend the plan and a participant's rights under § 510 is the product of a careful balance of competing interests, and is most surely not the type of "absurd or glaringly unjust" result, *Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Compensation Programs,* 519 U. S. 248, 261 (1997), that would warrant departure from the plain language of § 510.

Respondents argue that the Court of Appeals' decision must nevertheless be affirmed because § 510, when applied to benefits that do not "vest," only protects an employee's right to cross the "threshold of eligibility" for welfare benefits. See Brief for Respondent Atchison, Topeka & Santa Fe Railway Co. et al. 18. In other words, argue respondents,

an employee who is eligible to receive benefits under an ERISA welfare benefit plan has already "attain[ed]" her "right[s]" under the plan, so that any subsequent actions taken by an employer cannot, by definition, "interfer[e]" with the "attainment of . . . right[s]" under the plan. According to respondents, petitioners were eligible to receive welfare benefits under the SFTS-Teamsters plan at the time they were discharged, so they cannot state a claim under § 510. The Court of Appeals' approach precluded it from evaluating this argument, and others presented to us, and we see no reason not to allow it the first opportunity to consider these matters on remand.

We therefore vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*