

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2004

# Makenta v. Univ PA

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1354

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Makenta v. Univ PA" (2004). *2004 Decisions*. Paper 1057.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1057

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1354

BAH BAI MAKENTA,
                                    Appellant

v.

UNIVERSITY OF PENNSYLVANIA

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 98-cv-03376
District Judge:  The Honorable Ronald L. Buckwalter

Submitted Under Third Circuit LAR 34.1(a)
January 13, 2004

Before: BARRY, SMITH, and GREENBERG, Circuit Judges

(Opinion Filed: January 30, 2004)

OPINION

BARRY, Circuit Judge

　　Appellant Bah Bai J. Makenta, who was employed by appellee University of

Pennsylvania ("Penn" or "University") and subsequently laid off, asks us to reverse the

District Court's order granting Penn's motion for summary judgment and dismissing his action for intentional deprivation of his pension and welfare benefits, in violation of ERISA Section 510, 29 U.S.C. § 1140 ("Section 510"). We will affirm.

**I.**

The parties are familiar with the facts of this case, and, thus, we will provide but a brief summary of those facts at the outset, incorporating additional facts only as necessary to our discussion of the issues.

Penn employed Makenta from 1967 to 1970, and again starting in 1988, in its facilities management division, most recently as a construction coordinator. He was among those Penn employees laid off in March 1998 when Penn outsourced its facilities management operations.

In the spring of 1994, Penn hired Coopers and Lybrand ("Coopers") to provide advice on improving services and increasing cost efficiencies, culminating in Coopers' December 1994 report. In January of 1995, University President Judith Rodin announced that Penn was pursuing an "Agenda for Excellence"; specifically, Rodin explained that

> The drive for better service and higher quality at the lowest possible cost will increasingly dominate the higher education environment, just as it has for business and government . . . Only by striving for fiscal, administrative and academic excellence will Penn, and Penn's people, achieve their full potential in such a climate.

To realize these goals, Coopers recommended changes to the administration and substance of Penn's compensation and benefits packages, and high-ranking Penn officials

2

emphasized the importance of generally reducing administrative costs while improving administrative services. In 1996, University Executive Vice President John A. Fry noted the necessity of reducing the escalating costs of the benefits system while maintaining total compensation at competitive levels. Fry also stated that Penn would use outsourcing in certain areas.

Penn administrators, as part of their general concerns, were dissatisfied with the performance of facilities management, which was unable to meet Rodin's goals. In particular, Fry, in his declaration filed in this litigation, stated that it "was viewed as not appropriately managing the staffing and budgeting of construction projects," and that outsourcing would better serve Penn's facilities management needs. Fry claimed that the "paramount considerations animating the decision to outsource the Facilities Management Division were the needs to: (1) improve the quality of facilities management services; and (2) deliver services in more efficient and effective ways." Fry also stated that "[b]enefits cost savings were entirely irrelevant in determining whether to outsource the facilities management functions to an outside entity and, in fact, no comparative benefits costs savings studies were prepared."

Penn entered into an agreement on October 1, 1997 with Trammell Crow Higher Education Services, Inc., a subsidiary of Trammell Crow Corporate Services, Inc. (together "Trammel Crow"), to outsource most of Penn's facilities management operations. Trammel Crow agreed to hire at least seventy percent of the terminated Penn

3

employees who applied, at salaries at least equal to those received from Penn, and with Trammel Crow's benefits. It also agreed to pay additional amounts to these employees to offset any increased out-of-pocket costs attributable to differences between Penn's and Trammel Crow's medical, dental, and vision benefits.[1] On December 5, 1997, Penn notified facilities management employees that their employment would be terminated as of March 1, 1998 (later changed to March 31, 1998), and gave them several options: seek another position at Penn, seek employment from Trammel Crow, or take a severance. On April 1, 1998, 77 former Penn employees – eighty percent of those who applied – became Trammel Crow employees. Five who applied were not hired, among them Makenta. As a result, he claims to have lost protected life insurance, retirement, and tuition reimbursement benefits.

Makenta filed this action on July 1, 1998, alleging that Penn terminated his employment in an effort to intentionally interfere with his receipt of protected pension and welfare benefits in violation of Section 510.[2] Penn, in its answer to the complaint, stated that its decision to outsource was intended to "effectuate legitimate and fundamental business objectives," and that it went to "extraordinary lengths to protect the

---

[1]Makenta claims that Trammel Crow's life insurance and health benefits were substantially lower than those offered by Penn, and that Trammel Crow did not offer tuition reimbursement benefits at all.

[2]Makenta filed this action both on his own behalf and as a representative of a putative class of former employees. In its September 25, 2001 order, the District Court held that Makenta was an inadequate class representative. Makenta's interlocutory appeal of the denial of class certification was dismissed as untimely.

affected workers" by negotiating comparable salary and benefits for those employees who were employed by Trammel Crow.

In June of 2002, Penn moved for summary judgment and on January 8, 2003, the District Court granted Penn's motion. The Court concluded that Makenta was unable to establish a prima facie case that Penn discharged him with the specific intent to interfere with his right to obtain benefits protected under ERISA, and that there was no evidence that Penn's legitimate nondiscriminatory reason for outsourcing was a pretext. Makenta now appeals.[3]

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

A court may grant summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must view all evidence, and draw all inferences therefrom, in the light most favorable to the non-moving party, here Makenta. See, e.g., Williams v. Morton, 343 F.3d 212, 216 (3d Cir. 2003). Our review of the District Court's grant of summary judgment is plenary. See,

---

[3]The District Court denied Penn's motion for summary judgment with respect to its counterclaim asserting the validity of a general release by Makenta of Penn and denied Makenta's motion under FED.R.CIV.P. 56(f). The parties subsequently agreed to dismiss Penn's counterclaim and Penn agreed to provide the discovery Makenta requested in his 56(f) motion. Thus, we need not reach those issues.

5

e.g., <u>Sutton v. Rasheed</u>, 323 F.3d 236, 248 (3d Cir. 2003).

Makenta challenges the District Court's conclusion that no genuine question of material fact exists with respect to whether Penn violated Section 510, which makes it unlawful for "any person to discharge ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...." 29 U.S.C. § 1140. The legal standard in Section 510 cases is, as we recently explained, "very clear":

> To recover, a plaintiff must demonstrate that the defendant had the "'specific intent'" to violate § 510. [<u>DeWitt v. Penn-Del Directory Corp.</u>, 106 F.3d 514, 522 (3d Cir. 1997) (quoting <u>Haberen v. Kaupp Vascular Surgeons Ltd.</u>, 24 F.3d 1491, 1501 (3d Cir. 1994))]. This requires the plaintiff to show that "the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits." <u>Id.</u> at 523 (citing <u>Gavalik v. Continental Can Co.</u>, 812 F.2d 834, 860 (3d Cir. 1987)). The plaintiff may use both direct and circumstantial evidence to establish specific intent, but when the plaintiff offers no direct evidence that a violation of [Section] 510 has occurred, the court applies a shifting burden analysis, similar to that applied in Title VII employment discrimination claims. <u>See</u> <u>Gavalik</u>, 812 F.2d at 851-53 (applying the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), shifting burdens mechanism). In this burden-shifting analysis, the plaintiff must first establish a prima facie case by showing "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." [<u>Gavalik</u>, 812 F.2d] at 852, [<u>McDonnell Douglas</u>,] 93 S.Ct. 1817. If the plaintiff is successful in demonstrating her prima facie case, the burden then shifts to the defendant-employer, who must articulate a legitimate, nondiscriminatory reason for the prohibited conduct. If the employer carries its burden, the plaintiff then must persuade the court by a preponderance of the evidence that the employer's legitimate reason is pretextual. <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S.

6

248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

DiFederico v. Rolm Co., 201 F.3d 200, 204-05 (3d Cir. 2000). Applying this burden shifting analysis, the District Court concluded that Makenta had not established a prima facie case. We agree.

First, by his own admission (at his deposition), Makenta presented no direct evidence that Penn specifically intended to interfere with his attainment of protected benefits:

> Q:     [A]s we sit here today, other than the fact that you were losing your job and that would cost you your benefits, do you have any evidence available to you suggesting that [Penn's] actions were taken to interfere with your benefits? A conversation you overheard? A document?
>
> A:     I have no evidence.
>
>                                   * * *
>
> Q:     [D]o you have any evidence, sir, that [your boss's] actions were taken with a specific intent to interfere with your benefits?
>
> A:     No, I don't have any evidence.

Our review of the record also discloses no direct evidence that Penn had the required specific intent.

Because, however, there is rarely "smoking gun" evidence of specific intent, we have held that specific intent can be shown by circumstantial evidence. See Eichorn v. AT&T Corp., 248 F.3d 131, 150 (3d Cir.), cert. denied, 534 U.S. 1014 (2001) (quoting DeWitt, 106 F.3d at 523 (quoting Gavalik, 812 F.2d at 851)); Hendricks v. Edgewater

7

Steel Co., 898 F.2d 385, 389 (3d Cir. 1990) (citing Gavalik, 812 F.2d at 852).

Economic benefits enjoyed by defendants when pension benefits are cancelled can be circumstantial evidence of specific intent, particularly when other circumstances make that cancellation suspicious. See Eichorn, 248 F.3d at 149-50 (where plaintiff's employer was purchased by another company, and entered into an eight month re-employment no-hire agreement that extended just beyond the vesting period for plaintiff's pension benefits, plaintiff presented sufficient circumstantial evidence of intent to interfere with his benefits to survive summary judgment).

Nevertheless, "'[w]here the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him.'" Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir. 1990) (quoting with approval Clark v. Resistoflex Co., 854 F.2d 762, 771 (5th Cir. 1988)) (emphasis added). Thus, "[p]roof of incidental loss of benefits as a result of a termination will not constitute a violation of section 510," DeWitt, 106 F.3d at 522 (citing Gavalik, 812 F.2d at 853), and vague allegations of malicious termination, unsupported by any facts, are insufficient to support a claim for violation of Section 510. See Romero v. SmithKline Beecham, 309 F.3d 113, 119 (3d Cir. 2002); see also Inter-Modal Rail Employees Assoc. v. Atchison, Topeka & Santa Fe Railway Co., 520 U.S. 510, 516 (1997) (when an employer acts without the

8

purpose of interfering with employees' attainment of protected rights under a plan, "as could be the case when making fundamental business decisions, such actions are not barred by § 510").

The circumstantial evidence here is too general and too far removed from the decision to terminate Makenta to carry the day. President Rodin's "Agenda for Excellence" made clear her intention to generally improve services at Penn while lowering costs. Coopers was called upon to help design and implement Rodin's plan three years before the Trammel Crow agreement and emphasized cost efficiencies primarily in the administration, not the substance, of Penn's benefits program.[4]

Other circumstantial evidence is equally general and far removed from the decision to outsource. A 1995 "Strategic Plan" for implementing the Agenda for Excellence, published two years before the Trammel Crow outsourcing agreement, called for Penn to "[s]treamline, improve, and reduce the costs of [its] benefit system while maintaining total compensation at levels consistent with those of peer institutions." Following publication of this plan, Fry stated in September 1995 that Penn would "'focus on delivering significant cost reductions and service improvements'" in the targeted administrative areas. In February 1996, Fry stated that Penn wanted to "reduce the cost of

_____

[4]The one exception was Penn's tuition reimbursement program, which Coopers found to be "more generous" than those provided by peer institutions. That benefit, however, is not protected under ERISA, see 29 C.F.R. § 2510.3-1(k), and therefore its reduction or elimination cannot be the basis for a Section 510 claim.

9

center and school administration by $50 million over the next 5 years," and specified that "[t]he need is to reduce costs of the benefits system while maintaining total compensation at competitive levels ... Penn needs to drive down Employee Benefits (EB) rate from 33% into the 20's." He stated that "[p]roblems in benefits are escalating costs (a 27.4% increase over 3 years, to a total of $131 million); too many options, which increases costs but diminishes the management of benefits; and a 'richness in plans that has no clear market linkage' – with tuition reimbursement and retirement plans as examples." Despite Makenta's arguments to the contrary, the plan and Fry's statements, made long before the Trammel Crow contract was signed, do not show that Makenta was fired to avoid paying his benefits. Instead, they demonstrate Penn's legitimate business goal to reduce the overall costs of administering the benefits program while bringing benefits generally within the range of market competitiveness.[5]

When outsourcing came up in June 1996, Fry stated that it would be "used selectively, and only in those areas where it can demonstrably improve services and reduce costs while at the same time serving the specific needs of the University community." Fry's declaration in this litigation demonstrates that Penn's motivation for

---

[5]Comments by the Faculty Senate Executive Committee do not suggest otherwise. The Committee found that "Penn's 30.1% employee benefits rate may be among the highest at comparable institutions," and that "[t]he administration's objective is not to reduce benefits but in the face of declining University resources additional cost sharing by faculty and staff may be necessary." These observations correspond to the overarching goal espoused by the administration, and are, in any event, not linked in any way to the decision in 1997 to outsource facilities management or fire Makenta.

outsourcing facilities management was to improve quality and deliver services more efficiently and effectively, not benefits cost savings. Indeed, Makenta knew about Penn's dissatisfaction with facilities management: he explained in his deposition that it was known that the administration thought supervisors were overpaid, that the department was top heavy, and that management failed to upgrade the department. And when the outsourcing occurred, Penn went to great lengths to ensure that – tuition reimbursement aside – Trammel Crow compensated former Penn employees with equal benefits, even through salary top-offs to make up for benefit deficiencies. Makenta offers nothing but speculation and conclusory allegations to rebut the unambiguous record.

Finally, Makenta's emphasis on the alleged savings Penn enjoyed because it fired him does not help his case. Makenta's identification of over $6 million in benefits savings in <u>1996</u> has no bearing on whether Penn saved money by firing him in <u>1998</u>.[6] A May 2001 Agenda for Excellence update is more likely (if only because of its date) to reflect the financial impact of the Trammell Crow outsourcing, but even it is too general to support an allegation that Penn had the specific intent to interfere with Makenta's receipt of benefits.

In sum, there is little if anything to suggest that Penn fired Makenta with the

---

[6]And as Penn also notes, this purported savings is not found in the record. The $6,719,602 figure Makenta recites in his brief appears to be the total amount budgeted in 1996 for benefits, and not the amount (if any) saved in 1996 by reducing or eliminating benefits.

specific intent to reduce or eliminate his benefits.  Even if Makenta had made out a prima

facie case of a Section 510 violation, however, Penn articulated a legitimate, non-

discriminatory reason for acting as it did,[7] and Makenta did not show that that stated

reason was pretextual and that Penn's real reason was unlawful.[8]

The order of the District Court dated January 8, 2003 will be affirmed.


TO THE CLERK OF THE COURT:

Kindly file the foregoing Opinion.



**/s/ Maryanne Trump Barry**
Circuit Judge

---

[7]Cutting costs, even if that alone were a motivating factor here, can be a legitimate reason for its decision to eliminate certain benefits.  See Berger v. Edgewater Steel Co., 911 F.2d 911, 923, n.17 (3d Cir. 1990) (dicta).

[8]While Makenta need not prove that the "the sole reason" for his termination was to interfere with his rights, once Penn articulated and presented evidence of a legitimate, nondiscriminatory reason for its action, Makenta must meet his "ultimate burden of persuasion" by proving that Penn discriminated against him. DiFederico, 201 F.3d at 206 (citing Miller v. CIGNA Corp., 47 F.3d 586, 597 (3d Cir. 1995)).  To satisfy this burden in a circumstantial evidence case, Makenta must prove that "the legitimate reason proffered by the defendant was pretext for the real discriminatory reason ... either directly by persuading the court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." DiFederico, 201 F.3d at 206 (citing Burdine, 450 U.S. at 256).

12