# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-1902

_____

| | | |
|---|---|---|
| Dallas Deane Register; Toney P. Freeman; James H. Frerichs; Scott Patrick Henry; Emelia Kelley; Joseph C. Lewis; Don T. Lynch; David A. Shepherd, | * * * * * * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Honeywell Federal Manufacturing & Technologies, LLC, | * * | |
| | * | |
| Defendant - Appellee. | * | |
| | * | |
| _____ | * | |
| | * | |
| Gerald W. Lawson, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Honeywell Federal Manufacturing & Technologies, LLC, | * * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: January 14, 2005
Filed: February 17, 2005

_____

Before MURPHY, McMILLIAN, and BYE, Circuit Judges.
_____

MURPHY, Circuit Judge.

Former employees of Honeywell FM&T, LLC, including Dallas Deane Register and Gerald W. Lawson, sued the company after their positions were outsourced, alleging violations of the Employment Retirement Income Security Act (ERISA), the Age Discrimination in Employment Act (ADEA), and Title VII. They alleged in particular that Honeywell terminated their employment with the intent to interfere with their pension benefits, in violation of § 510 of ERISA, 29 U.S.C. § 1140. The district court[1] granted summary judgment to Honeywell, and the former employees appeal only the dismissal of their § 510 ERISA claims. We affirm.

Before the outsourcing, appellants had worked in the facilities and utilities engineering groups at Honeywell's Kansas City manufacturing plant. As a government contractor Honeywell manages and operates the Kansas City plant for the Department of Energy (DOE), and Honeywell or one of its predecessors has operated the plant since 1949. Honeywell's contract with DOE provides that the government pays all management and operation costs at the plant, including employee compensation and benefit costs, and Honeywell receives an incentive fee based on performance and other awards.

The facilities engineering group at Honeywell was responsible for the design and implementation of onsite construction projects, and the utilities engineering group was responsible for maintaining onsite facilities such as heat, ventilation, air conditioning, water, and electricity. Honeywell president Karen Clegg was

_____

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

-2-

dissatisfied with the senior management and the performance of the facilities and utilities groups, and the company hired a consultant in 1995 to study its facilities operations. That study concluded that the facilities engineering group was too large and did not meet the standards of private industry. The study also found that a significant contributor to the problems in the area was turnover at the senior management level.

Since 1949 DOE had renewed contracts to operate the Kansas City plant without competitive bidding, but in 1998 Honeywell received information that DOE would likely open the contract to outside bidders. This information was later confirmed, and Honeywell hired consultant Darrell Elliott to help develop a strategy for its bid on the contract. Elliott assisted Honeywell in performing a self assessment to determine its strong and weak areas. He recommended that the company address any potential weaknesses and urged Honeywell to consider outsourcing some functions to companies that were stronger in the weaker areas. The self assessment identified security, the cafeteria, and facilities and utilities engineering as areas whose outsourcing could strengthen Honeywell's contract proposal to DOE. Honeywell states that Elliott's recommendation was consistent with the DOE policy described in its 1994 report "Making Contracting Work Better and Cost Less." That report encouraged contractors to consider whether subcontracting or outsourcing would be cost effective.

David Douglass became vice president for operations at Honeywell in January 2000, with supervision over the facilities and utilities groups. He received feedback from a local DOE officer that the facilities area had performed at a good level, but that there was room for improvement. Another source of concern for Honeywell was DOE's 1999 fiscal year report, which rated its facilities and utilities areas only as "good" while other areas received a rating of "outstanding." Douglass succeeded in getting Honeywell to seek a new director for the facilities and utilities functions in early 2000, but it did not find any acceptable candidates. Honeywell states that it was

about this time that Douglass proposed that it follow Elliott's recommendation that facilities and engineering services be outsourced by subcontracting with a third party. The facilities and utilities engineering groups were seen as potential areas for outsourcing because they were not considered core competencies of Honeywell and they were commonly outsourced in private industry. The proposal was put before a focus group which concluded that DOE might prefer that Honeywell retain control of the utilities group but that it might "be the wrong approach" to continue with the facilities group in the same way.

In March 2000 Honeywell entered into discussions with three firms about outsourcing, and it then executed a memorandum of understanding with the engineering company Burns & McDonnell. That memorandum stated that DOE was expected to issue a formal request for proposal for the Kansas City plant, that each party would use best efforts to negotiate an agreement under which Burns & McDonnell would serve as a subcontractor for facilities and utilities engineering services, and that this would be incorporated into Honeywell's proposal. When DOE issued a formal request for proposal in April, Honeywell and Burns & McDonnell agreed to prepare one for submission. Honeywell informed its employees in May that it intended to propose outsourcing the facilities and utilities engineering groups and the cafeteria operations in its bid for the DOE contract.

At least five other companies notified DOE that they planned to submit a proposal, and representatives of other potential bidders toured the Honeywell Kansas City plant in May. Honeywell submitted its proposal to DOE on July 14 and learned in October that it had been chosen; none of the other potential bidders actually submitted a proposal. Although DOE identified the outsourcing of the facilities and utilities functions as a weakness in Honeywell's overall proposal, it ultimately approved the subcontract with Burns & McDonnell.

Honeywell established eleven positions that would remain in the company to oversee and coordinate the facilities and utilities functions, and it indicated that all employees in the facilities and utilities groups could apply for them. Although the positions were filled from those groups, the five appellants who applied were not selected. Several facilities and utilities engineering employees asked to be transferred to other positions within Honeywell to avoid being outsourced to Burns & McDonnell, but Douglass announced that no other employees from the affected groups would be able to remain at Honeywell because the company wanted to ensure continuity of operations after work was transferred to Burns & McDonnell. According to Honeywell some internal debate followed, and it was decided that the employees who were to be outsourced would be allowed to apply for internal openings if an employee's skills were not necessary for the success of the outsourced operation. Honeywell states that as a result of this screening process, at least fifteen employees applied for internal openings and two were allowed to transfer within the company.

Appellants assert that permission to apply for internal transfers was given on an ad hoc basis without informing all of the employees that the initial transfer ban had been lifted, but Register and Lawson were cleared to apply for internal openings. Register applied for an internal position of industrial engineer, but that position was given to another employee before the hiring manager received Register's application. Both Register and Lawson expressed interest in applying for another engineering position and were cleared to apply, but they were later informed that the position was not going to be filled because the needs of the department had been reevaluated. Appellants point out, however, that Honeywell had said in a corporate newsletter that it anticipated filling many positions with outside talent because a number of its associates were becoming eligible for retirement.

In its April 2000 request for proposal, DOE had notified potential bidders that one of its goals was to maintain the value of employee benefit packages while at the

same time limiting its long term liability, and Honeywell agreed in its contract that it would submit a plan for achieving this goal. Appellants assert that Honeywell knew about DOE's desire to limit long term liability before the company made the decision to outsource their jobs to Burns & McDonnell. They claim that Honeywell recognized in February 2000 that a portable pension plan would be needed to ease the transition and to retain talent after the outsourcing. They were nevertheless not offered such a plan even though by the time of outsourcing in January 2001, one had been in place for months at other business units of the company. Honeywell disputes the accuracy of that claim. It says it had considered a portable pension plan for new and existing employees during 2000, but the idea was put on hold because of the potential acquisition of the company by General Electric.

Honeywell submitted a plan to DOE on October 31, 2001 in accordance with the contract provision requiring limitation of its long term liability. Honeywell's plan included a portable pension plan for new hires and an option for existing employees to leave their old pension plan and join a new one. This new plan provided earlier vesting of benefits than Honeywell's existing plan, but featured substantially lower retirement benefits for long term employees. It also eliminated the retirement medical coverage that had been available under the previous plan, fees for health insurance were increased, and long term disability and survivor benefits were eliminated. The portable pension plan was put in place for new hires at Honeywell in March 2001, and it became available to all Honeywell employees in 2002. Appellants ceased to be Honeywell employees in January 2001, and they were never offered a portable pension plan.

Effective January 2, 2001, the facilities and utilities engineering functions were outsourced to Facilities and Engineering Services (FES), a subsidiary of Burns & McDonnell created for this purpose. Honeywell terminated the nine employees involved in this case and 46 others in the facilities and utilities groups, and all were offered employment at FES. Appellants accepted the offer, and Burns & McDonnell

placed one of its managers in charge of the outsourced FES operation and added others. The outsourced employees remained at the same desks in the Honeywell facility and performed the same functions as they had when they worked for Honeywell.

The outsourced employees had been participants in Honeywell's pension plan which was a defined benefit plan. That plan provided for normal retirement at age 65 and early retirement at age 55 or when the sum of the participant's age and years of service equaled 80 (80 point retirement). A plan participant who worked at Honeywell for more than five years but did not qualify for either normal or early retirement would receive a vested benefit which was significantly lower than one received upon retirement. After the outsourcing decision was made, Honeywell amended its pension plan to allow affected employees who were approaching a retirement milestone to receive an unpaid "bridge" leave of absence so they could reach the milestone. This bridge leave was available to employees who were either within twenty four months of reaching age 55, thirty six months of reaching age 65, or 80 point retirement. The bridge leave allowed ten outsourced employees to attain full retirement benefits, and twenty six of the fifty five outsourced employees are or will be eligible for at least early retirement benefits. Although appellant Lawson was three weeks short of age 53 at the time of the outsourcing, Honeywell allowed him to use accrued paid leave to remain on its payroll until his fifty third birthday so he too could take advantage of the bridge leave opportunity.

In preparation for the outsourcing, Honeywell worked with Burns & McDonnell to design a compensation and benefit package for the outsourced employees at its FES subsidiary. The FES salary for each of the nine appellants at FES was equal to or greater than the salary received at Honeywell, and FES employees were eligible for bonuses that were not available at Honeywell. The outsourced employees at FES came under a Burns & McDonnell benefit package which did not include a defined benefit plan like Honeywell's pension plan, but Burns

& McDonnell created two additional defined contribution plans for the FES employees. Honeywell commissioned a study of its benefit package compared to the one at FES. The first study indicated that the value of the FES package would be approximately 90% of Honeywell's. Burns & McDonnell enhanced the FES benefit package in response, with the result that the FES package was valued at 95% of Honeywell's, or 105% if possible bonuses were considered.

Appellants claim they lost their right to future benefit accruals and their retirement medical benefits as a result of their outsourcing, and they allege that both DOE and Honeywell benefitted financially from the change. They point to DOE's Annual Report on Contractor Work Force Restructuring for fiscal year 2001, which stated that 71 employees were outsourced from the Kansas City Honeywell plant, that the workforce restructuring cost $9,502, and that the estimated savings to the government in salary and benefits from the 71 outsourced positions was $5.7 million. Appellants claim that Honeywell shares in any savings the government experiences from reducing costs, including employee benefits. Honeywell disputes this contention, stating that the pension plan is funded by DOE and that any cost savings accrue only to it. Moreover, Honeywell's pension plan was fully funded in 2000 and actuarial projections indicated that no contributions would be needed for the next fifteen years. Honeywell also asserts that any financial benefit DOE may have received from the outsourcing is offset by its additional expenses for funding the defined contribution plans and bonuses for the outsourced employees.

After the employees were transferred out of Honeywell, Register filed a complaint in district court. It alleged as amended that Honeywell had discriminated against him on the basis of his age, in violation of the ADEA and Title VII, and terminated him in order to interfere with his pension rights, in violation of § 510 of ERISA, 29 U.S.C. § 1140. Lawson filed a separate action, alleging identical violations of the ADEA and Title VII, and ERISA. Register later successfully moved to amend his complaint to add a claim that Honeywell violated 29 U.S.C.

§ 1132(a)(1)(B) of ERISA, by failing to pay severance benefits, and to add seven other plaintiffs on the two ERISA claims. The court granted a joint motion to consolidate the Register and Lawson cases, and Honeywell moved for summary judgment.

The district court granted Honeywell's motion on July 31, 2003, dismissing all of the claims against the company. Appellants moved for reconsideration on their claim under § 510 of ERISA, but the court denied the motion and judgment was entered against them. Their appeal from the judgment is founded only on the dismissal of their § 510 ERISA claim alleging interference with their pension rights. They contend that the district court erred by considering the affidavit testimony of Honeywell consultant Darrell Elliott and by concluding that one of Honeywell's reasons for the outsourcing was not pretextual. Honeywell responds that the decision to outsource was an exercise of legitimate business judgment and that the district court correctly dismissed the claims.

We review the district court's grant of summary judgment de novo. Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 841 (8th Cir. 2002). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Section 510 of ERISA makes it unlawful for an employer to discharge a participant in an employee benefit plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the

plan." 29 U.S.C. § 1140. To prevail under § 510 appellants must show that Honeywell had a specific intent to interfere with their pension benefits, but that may be shown by circumstantial evidence. Regel v. K-Mart Corp., 190 F.3d 876, 881 (8th Cir. 1999).

In overruling the appellants' objection to Darrell Elliott's affidavit, the district court observed that it had not been offered as an expert opinion to show that Honeywell's decision to outsource was a prudent one, but rather as evidence of its motive for outsourcing. Appellants claim that the district court erred by considering the affidavit because it lacked foundation and was in reality an unreliable expert opinion. They assert that the affidavit contained no facts to support Elliott's opinion that outsourcing would strengthen Honeywell's bid for the DOE contract and that it was inadmissible under Federal Rule of Evidence 602 because it was opinion testimony based on specialized knowledge, training, and experience gained as a consultant, citing United States v. Peoples, 250 F.3d 630, 640-42 (8th Cir. 2001). Honeywell responds that Elliott was a fact witness, not an expert witness, and that his testimony regarding the advice he gave Honeywell was relevant to show its reasons for outsourcing.

We conclude that Elliott's testimony was relevant to Honeywell's motive. His affidavit outlined the self assessment process he suggested to Honeywell and the advice he gave it to consider subcontracting in order to improve its bid to DOE. As the district court noted, his testimony was relevant in determining whether Honeywell's decision to outsource was motivated by an intent to interfere with pension benefits. See, e.g., Koons v. Aventis Pharms., Inc., 367 F.3d 768, 778 n.6 (8th Cir. 2004) (relevant issue in § 510 case was not whether employee violated company policy, but whether employer honestly believed he had). This case is different from Peoples, on which appellants rely. The trial court in Peoples erred by admitting as lay testimony the opinion of an FBI agent explaining the meaning of language used in intercepted conversations in which she had not participated. In

contrast, Elliott testified as a fact witness about his personal experiences while working with Honeywell and about the advice he had given the company. We conclude that appellants have shown no reason why Elliott's affidavit should not properly be considered and that the district court did not abuse its discretion in admitting it.

Claims brought under § 510 are analyzed under the McDonnell Douglas burden shifting framework. Eckelkamp v. Beste, 315 F.3d 863, 871 (8th Cir. 2002); see Griffith v. City of Des Moines, 387 F.3d 733, 736-37 (8th Cir. 2004). If plaintiffs show a prima facie case of a violation of § 510, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the outsourcing. If the defendant does so, the burden shifts back to the plaintiffs to prove that the defendant's proffered reason was pretextual. Eckelkamp, 315 F.3d at 871.

Appellants argue that the district court correctly held that they established a prima facie case of interference under § 510 but contend that it should have also held that both of Honeywell's stated reasons for the outsourcing were pretextual. They assert that Honeywell's failure to provide them with a portable pension plan, even though it recognized the need for such a plan, and provided the option of such a plan to other business units prior to the outsourcing, shows that it had financial incentive to interfere with their pensions. They also point out that Honeywell's contract with DOE entitled it to share in cost savings and that Honeywell could benefit in the competitive bidding process by showing that it was saving the government millions of dollars in employee benefits by outsourcing the groups.

Honeywell responds that appellants neither made a prima facie case nor showed that its legitimate business decisions were pretextual. Honeywell had no financial incentive to interfere with their pension benefits it says, since DOE funded all of the company's pension benefit expenses and any savings to DOE would not be shared with it. The company also asserts that the decision to outsource was motivated

by a desire to improve performance and retain the DOE contract. To support its argument that the outsourcing was a legitimate and nondiscriminatory business decision, Honeywell points to evidence about concerns it had with senior management in the facilities and utilities engineering groups, Elliott's advice that it outsource functions that were not core competencies, and DOE's general receptivity to outsourcing. It also argues that appellants have not shown any ERISA related characteristics suggesting that their groups were singled out for adverse treatment, citing Andes v. Ford Motor Co., 70 F.3d 1332, 1338 (D.C. Cir. 1995), for this argument.[2]

The district court concluded that the first reason advanced by Honeywell, to improve performance in the facilities and utilities engineering groups, was pretextual but that the second, to make its bid to DOE more competitive, was not. Appellants contend that the court's conclusion regarding the first reason was correct because after the outsourcing the same employees performed the same jobs. They also point to the deposition of the president of Honeywell, where she said not only that she had been dissatisfied with the senior management in those groups, but also with the employees. They argue that the second reason was also pretextual and point to a Honeywell planning document showing that DOE was satisfied with the former facilities and utilities engineering groups and that it preferred to keep the utilities function under its own control. Appellants also note that DOE never recommended that Honeywell outsource the groups and that Honeywell was aware of DOE's desire to reduce long term liabilities for employee benefits before it proposed outsourcing. They cite Eichorn v. AT&T Corp., 248 F.3d 131, 149 (3d Cir. 2001) cert. denied, 534 U.S. 1014 (2001), and Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir. 1990), for the proposition that monetary savings to an employer resulting from termination

---

[2]We note that subsequent to Andes, the Supreme Court decided Inter-Modal Rail Employees. Ass'n v. Atchison, Topeka & Santa Fe Ry., 520 U.S. 510 (1997), in which it concluded that employees whose jobs were subcontracted could bring a claim under § 510 for interference with their welfare benefits.

of employees may be viewed as a motivating factor sufficient to satisfy the intent element of § 510. As additional evidence that Honeywell's real intent was to interfere with their pension benefits, they point to the lack of documentation regarding Elliott's consultation, deposition testimony of Clegg and Douglass which scarcely mentions Elliott's recommendation, the failure to provide a portable pension plan, and the blocking of internal job transfers.

Appellants also argue that the two reasons Honeywell offered for the outsourcing were closely intertwined and that the pretextual nature of the first reason was so obvious that it casts doubt on the second reason. Summary judgment was therefore inappropriate they say, citing Wolf v. Buss Am. Inc., 77 F.3d 914, 920 (7th Cir. 1996) (employee must raise an issue of fact regarding each reason offered by the employer unless the reasons are intertwined or one is "fishy and suspicious"). They argue that the proferred reasons are intertwined because Honeywell asserts that the outsourcing would make its bid to DOE more competitive by increasing performance in one of its weaker areas.

Although appellants established a prima facie case, Honeywell articulated legitimate, nondiscriminatory reasons for its outsourcing, particularly in respect to its desire to maintain its contract with DOE. Honeywell also presented evidence that it was unhappy with senior management in the facilities and utilities engineering groups, that it had unsuccessfully attempted to hire a new director for these groups, and that it believed placing these groups under the management of Burns & McDonnell would improve performance. Once outsourced, changes were indeed made to the management of the groups. They were placed under the direction of a manager from Burns & McDonnell and additional managers from Burns & McDonnell were brought in to work at FES. Honeywell also presented evidence that it was advised by a consultant that outsourcing the groups would increase its chances of retaining the DOE contract. The fact that DOE did not recommend this approach, and ultimately questioned it, is not evidence that Honeywell was motivated by a

desire to interfere with the employees' pension rights. The issue is what the employer honestly believed, not whether it was right. Koons v. Aventis Pharms., Inc., 367 F.3d 768, 778 n.6 (8th Cir. 2004). The evidence also shows that Honeywell was considering outsourcing the groups before it received the April 2000 memo from DOE, stating that the government wanted to limit its long term liability regarding employee benefits.

We conclude that appellants did not meet their burden to show that Honeywell's proffered reasons were pretextual. They argue that Honeywell's restrictions on internal transfers were evidence of pretext, but Honeywell produced evidence that the restrictions were put in place to ensure continuity of operations at FES and that it amended its pension plan to allow twenty six of the fifty five outsourced employees to reach a retirement milestone. The company also worked with Burns & McDonnell to create a benefit package for the outsourced employees at FES that included higher salaries, the opportunity to earn bonuses, and two defined contribution plans funded by DOE. After an initial study showed the package was only 90% of Honeywell's, it was enhanced to make it comparable or even better than Honeywell's if bonuses were included in the calculation. Appellants did not succeed in undermining the evidence that Honeywell had legitimate business reasons for the outsourcing or demonstrate that these were not its real reasons.

We conclude in sum that Honeywell was entitled to summary judgment on appellants' § 510 claims, and we affirm the judgment of the district court.

_____